THE HONORABLE JAMAL N. WHITEHEAD

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR25-013-JNW |
| Plaintiff, | |
| v. | TATENDA BANGA'S SENTENCING MEMORANDUM |
| TATENDA BANGA, | |
| Defendant. | |

    Tatenda Banga has never had a home. When he was a child, his mom abandoned him and his family, and he was put into one boarding school after another, where adults and his mostly white classmates abused and bullied him. He still avoided going home on weekends because his step-mother's abuse was even worse. As soon as they could, his older sisters left and joined the Zimbabwean diaspora. Mr. Banga eventually did the same, going to college in St. Louis on a rugby scholarship. Despite his intelligence and great academic record, and even though he walked the stage at graduation, a combination of debt, culture shock, and depression prevented him from getting his diploma. He went into the food service industry, the pandemic hit, and his mental health got worse. Out of desperation, he hit the road, going to California, up the west coast, and then into Canada. He hoped to live with family, but ultimately could not. He got temporary refugee status and worked lawfully in Canada, but then also got involved in criminal activity, ultimately leading to him unlawfully possessing a gun and drugs with intent to distribute.

DEFENSE SENTENCING MEMORANDUM
(*United States v. Banga*, No. CR25-013-JNW) - 1

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, WA 98101
(206) 553-1100

Mr. Banga's lack of a home and stability has defined his life and is epitomized by the offense. While this instability was partially foisted on him throughout his life, he accepts his own responsibility for it, writing that "I don't know how to stick to a plan." Ex. 1 (Tatenda Banga's letter). His family and friends are universally shocked by his misconduct but provide the context of the various forms of abuse and instability that he faced throughout his life, and his erratic decision to leave St. Louis and travel up the west coast and into Canada. Ex. 2 (support letters); Ex. 3 (family pictures, sealed).

While his time in jail shook him out of this erratic episode, instability will continue being foisted upon him. Mr. Banga asks the Court to impose time served, and if it doesn't,[1] to recommend BOP designate him at FCI Fort Dix, where he may be able to learn hydroponics, horticulture, and woodworking, and will be close to family. Ex. 1. Regardless, Mr. Banga will likely then go into immigration detention, which carries uncertainty, delays, and horrors that are making the front page every day. After that, he will finally rejoin his family and make sure the next chapter of his adult life is stable, considered, and lawful.

## I.     MR. BANGA GREW UP WITHOUT A HOME.

Mr. Banga's mother abandoned him and his family when he was a child. PSR ¶ 55; Ex. 2 at 11 (Rufaro Banga) ("Our mother, whom I now believe may have undiagnosed bipolar disorder, left the family when I was around fourteen."). The abandonment felt sudden to Mr. Banga, but his older sisters say it came after years of pain. Ex. 2 at 2 (Agatha Banga) ("My parents separation has been a long drawn process, and started when Tatenda was perhaps 2 or 3. … In the time leading up to her departure, tensions were high. I remember that my Father had stopped coming home every day, and with that, his routine of taking us out for an evening drive to buy candy

---

[1] Either way, the Court should provide credit for time served beginning December 27, 2024, when the government arrested Mr. Banga near the border.

DEFENSE SENTENCING MEMORANDUM
(*United States v. Banga*, No. CR25-013-JNW) - 2

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, WA 98101
(206) 553-1100

had stopped. One day, my Father came home but wanted to leave without us. Tatenda, who was maybe 3 or so, clung tightly to Dad's suit trouser leg. As Dad continued walking, Tatenda howled uncontrollably despite Mum chasing after him. Tatenda eventually fell off the trouser leg.").

Mr. Banga was sent to boarding schools without his sisters. PSR ¶ 55. The adults in charge of the school and his mostly white classmates, especially in his early school years, abused and bullied him. PSR ¶ 56; Ex. 2 at 11 (Rufaro Banga) ("I remember how he endured racist mistreatment at boarding school—once being called 'boy' and subjected to other dehumanizing slurs…"). He had few fellow native citizens of Zimbabwe to connect with. PSR ¶ 56. He avoided "home," where his step-mother also abused him. PSR ¶ 57. In fact, the word "abuse" does not adequately capture it:

> The year I turned 7, my mom left the country during my first week at a new boarding school then at home a stranger said to call them mom or else. A good thing is the teacher taught us to write letters and I wrote one for my mom. The bad thing is the stranger found out. Then that stranger said to my dad, "My son I will beat to discipline, and your son I will beat to kill!" And pointed at me. That stranger was to be my step-parent at home for 11-years.

Ex. 1.

Family members describe more disturbing mistreatment. Ex. 2 at 2 (Agatha Banga) ("However, our step mother Magdalene was harsh, unkind and particularly perturbed by Tatenda being the heir of our family tree. She went out of her way to make his days tougher than required for a child. Tatenda, as I mentioned – loved his food. She locked the pantry – something she needed not do. She would yell at the chef if her pantry was opened and something else other than what she had approved had come out of it. … We were all constantly told that, 'you shouldn't be here, you are not wanted and that is why your Mother left you.'"); Ex. 2 at 20 (Cuthbert Banga) ("He would relate dreadful stories about how him and his siblings were ill-treated, and we also

DEFENSE SENTENCING MEMORANDUM
(*United States v. Banga*, No. CR25-013-JNW) - 3

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, WA 98101
(206) 553-1100

witnessed this during the times when my brother's family visited us in South Africa."). Mr. Banga soon lost even the temporary reunifications with his older sisters. Ex. 2 at 3 (Agatha Banga) ("At eighteen years, I left home and never returned. A sad moment as I left my younger sister, Zvashe and Tatenda to fend for themselves in a volatile household.").

Therefore, the Court should grant Objection 4 so that the ACEs score accounts for the abuse Mr. Banga suffered in every "home" he had. USPO argues that Mr. Banga only "answered yes to two questions." PSR p. 15. In fact, Mr. Banga and counsel pointed out that ACEs focuses on the household, but Mr. Banga was often at boarding schools, which were effectively a household, especially since he often spent weekends there. USPO said it would consider this, but did not discuss it in the PSR. Either way, the ACEs score should include collateral information, especially since trauma, by its nature, often cannot be recalled in the moment of answering a questionnaire.[2]

Unfortunately, even after emigrating to St. Louis for college on a rugby scholarship, Mr. Banga was lonely and experienced culture shock. PSR ¶ 59. He still tried his best to build community. Ex. 2 at 37 (Kudzai Zhou) ("Tatenda was also a pillar of support during one of the most difficult periods of my life. I suffered a series of injuries that ended my college rugby career prematurely, an experience that left me emotionally devastated and directionless. During that time, it was Tatenda who checked in on me daily, helped me with coursework when I struggled to stay focused, and consistently offered words of encouragement. … He even accompanied me to the gym during my rehabilitation just so I wouldn't feel alone."). While Mr. Banga walked the stage at graduation, he could not formally graduate. PSR ¶ 60. He was working in food service when the pandemic hit, worsening his mental health. PSR ¶ 76; Ex. 2 at 12

---

[2] Complex PTSD and Memory Loss, Hanley Foundation (July 31, 2023) ("Trauma can impair the brain's capacity to encode and recover memories efficiently."), https://www.hanleycenter.org/complex-ptsd-and-memory-loss.

DEFENSE SENTENCING MEMORANDUM
(*United States v. Banga*, No. CR25-013-JNW) - 4

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, WA 98101
(206) 553-1100

(Rufaro Banga) ("His life in America seemed to be marked by isolation, a lack of support, and employment that was not a good fit.").

Therefore, the Court should grant Objection 5 so that Mr. Banga's sentence accounts for his anxiety and depression. USPO and the government argue that he must present a formal "mental health disorder evaluation." PSR p. 15. This is a western-centric view that fails to account for "the history and characteristics of the defendant." *See* 18 U.S.C. § 3553(a)(1). As his oldest sister notes, their mother likely had "undiagnosed bipolar disorder," Ex. 2 at 12 (Rufaro Banga), and it seems formal diagnoses were simply not typically done in their culture. Moreover, while describing Mr. Banga's erratic behavior, she notes that "[s]ome of the irrational behavior and grandiose thinking we've heard about bear a troubling resemblance to patterns we witnessed in our biological mother." *Id*. *See also United States v. Cantu*, 12 F.3d 1506, 1513 (9th Cir. 1993) (holding that "both organic dysfunction and behavioral disturbances that impair the formation of reasoned judgments" are reasons for leniency at sentencing). Whatever his formal diagnoses may or may not be, "Mr. Banga's self-reported mental health and substance use disorders were contributing factors in the instant offense," USPO Rec. at 6, and the Court should account for them.

## II.    MR. BANGA HAS A BRIGHT FUTURE AHEAD.

Mr. Banga's offense was unusual—though related to lifelong instability and erratic behavior in the months before—and he can rehabilitate. As one lifelong friend puts it, "[t]he guy I knew had a conscience that would not allow him to brush off wrongdoing lightly." Ex. 2 at 34 (Duncan Scobie); Ex. 2 at 18 (Prince Nyatanga) ("I can't speak to all the details of what led to his current situation, but from what I understand, I think being far from home and trying to navigate life in a foreign country without a strong support system played a big role. I believe he lost his way and not because he's a bad person, but because he was trying to figure things out on his own,

DEFENSE SENTENCING MEMORANDUM
(*United States v. Banga*, No. CR25-013-JNW) - 5

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, WA 98101
(206) 553-1100

away from the people who've known him best."). His friends and family see his remorse. Ex. 2 at 37 (Kudzai Zhou) ("Tatenda has told me that this experience has been a harsh wake-up call, one that has shaken him to his core. He has described this period of reflection as the most painful and sobering chapter of his life, and I believe him. He has used this time to read, journal, reflect, and rebuild his mindset."). And as USPO puts it, "if he were to put his skillset to use in a purely positive direction, I am sure he would be successful in a legitimate way. USPO Rec. at 5; Ex. 2 at 10 (Zvashe Banga) ("Tatenda is incredibly talented and disciplined, an athlete, a musician, and more recently, someone interested in woodwork and building. The last time we spoke, we dreamed about building a tiny home together once he returns. I look forward to the day we can make that dream a reality. He also hopes to pursue law school or assist our father in managing family businesses back home.").

Moreover, and thanks to his lifelong efforts (even through all the instability) to build community, Mr. Banga's family and friends will support him. Ex. 2 at 1–2 (Agatha Banga) ("In the months leading up to his arrest, he sent a package with small lego pieces and fudge for my only son - alongside it a beautiful, handwritten card expressing how he hoped [Z] (my 3 year old son) would love it … I always have offered him an opportunity to to [sic] come and live with me whilst he figured things out. This would provide roof over his head, food and an opportunity to clear his mind."); Ex. 2 at 37 (Kudzai Zhou) ("Now I find myself in a position where I have to help pull him out of a dark place as he once did for me.").[3]

---

[3] Unfortunately, Mr. Banga has been unable to see his overseas supporters while detained at FDC. And while his dad traveled to see him weeks in advance of sentencing, FDC refused him entry, in violation of its posted policy. Specifically, FDC's website says that social visiting is allowed on some weekdays. SET 5267.09c at 2 (Feb. 21, 2024), https://www.bop.gov/locations/institutions/set/set_visit.pdf?v=1.0.0. But FDC staff refused entry to Mr. Banga's dad on an eligible weekday, claiming that social visiting has been on weekends only since the pandemic—even though the policy is dated

DEFENSE SENTENCING MEMORANDUM
(*United States v. Banga*, No. CR25-013-JNW) - 6

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, WA 98101
(206) 553-1100

And while a crime involving an unlawful gun and drugs inherently raises a concern of future danger, USPO points out that unlike in many cases, "[t]here is no connection between the firearm and the drugs in his possession." *See* USPO Rec. at 5.[4] But just as insufficient evidence connects the firearm and drugs, insufficient evidence supports USPO's repeated speculation that "Mr. Banga took part in deploying controlled substances." *See id*. at 5–6. While there are vague and mostly undated texts "suggesting Mr. Banga was involved in narcotics distribution," *see* PSR ¶ 23, these only support that he had intent to distribute the MDMA he possessed—not that he ever actually did so, or even attempted to do so. In other drug cases, the government conducts controlled buys—but it didn't here. And in other drug cases, the government investigates the senders and recipients of suspicious texts to map out the drug distribution network and place the defendant in it—but it didn't here.

Therefore, the Court should grant Objection 1, and remove alleged generalized harms of completed drug trafficking that are disconnected from the facts of this case. USPO relies on 18 U.S.C. § 3663(a)(1)(A) and USSG §5E1.1(d), PSR p. 14, but those discuss harms from "the offense" and "such offense" that the defendant was convicted of, not speculative harms that USPO "believes it is reasonable to assume" occurred. *Contra* USPO Rec. at 5.

Finally, Mr. Banga's lack of criminal history further shows his ability to rehabilitate and the low likelihood of future danger. PSR ¶ 48. Therefore, the Court should grant Objection 3, as the immigration and criminal systems are separate, and

---

February 2024. Mr. Banga, his family, and counsel have spent weeks trying to clarify social visiting policy with FDC, even involving the AUSA at one point, but FDC staff continue to contradict each other.

[4] The defense withdraws Objection 2, as the plea agreement implies the counts should not be grouped. Dkt. 23 at 9. However, in candor, USSG § 3D1.2(d) explicitly requires grouping the two counts.

DEFENSE SENTENCING MEMORANDUM
(*United States v. Banga*, No. CR25-013-JNW) - 7

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, WA 98101
(206) 553-1100

PSR ¶¶ 49–50 mislabels alleged immigration violations as "other *criminal* conduct" (emphasis added).

### III.  BUT FIRST, MR. BANGA FACES THE IMMIGRATION SYSTEM.

Before Mr. Banga can move forward, he will suffer through immigration detention and deportation. Courts have long recognized that this additional uncertainty, delay, and punishment are reasons to vary downward in criminal sentencing. PSR ¶ 99 (*United States v. Charry Cubillos*, 91 F.3d 1342, 1344 (9th Cir. 1996)); USPO Rec. at 6 ("The collateral consequences of his immigration status are significant."). Immigrants face not only deportation, but extra detention. *Jones v. Blanas*, 393 F.3d 918, 934 (9th Cir. 2004). ("With respect to an individual confined awaiting adjudication under civil process, a presumption of punitive conditions arises where the individual is detained under conditions identical to, similar to, or more restrictive than those under which pretrial criminal detainees are held, or where the individual is detained under conditions more restrictive than those he or she would face upon commitment."); *United States v. Estrada-Mederos*, 784 F.3d 1086, 1091 (7th Cir. 2015) ("Though the immigration custody is civil detention and the state custody is criminal incarceration, the similarities are too strong to ignore.").

Immigrants also face a collateral increase in criminal punishment, and that's especially true today, as immigrants with final orders of deportation are ineligible for time off up to half their sentence under the First Step Act. 18 U.S.C. § 3632(d)(4)(E)(i). The Court should therefore grant Objection 6 so that the PSR is, in USPO's words, more "specifically curated to address individuals who may be subject to deportation." PSR p. 16. The Court should also strike Special Condition 1 from the Judgment, which further increases the collateral punishment by entangling the criminal, supervision, and immigration systems.

DEFENSE SENTENCING MEMORANDUM
(*United States v. Banga*, No. CR25-013-JNW) - 8

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, WA 98101
(206) 553-1100

Moreover, the immigration system today has gone from mere extra punishment to outright horror. At the Northwest ICE Processing Center, for example, "[t]he drinking water … at times appears brown and yellow in color, meal times are inconsistent and delayed (to a point where dinner is served past 10:00 pm at times), meals are nutritionally insufficient, due to low staffing dorms of 70–80 people are at times supervised by just one officer and when violence breaks [out] officers have to wait for back up before intervening creating an unsafe situation.' [Petitioner] claims that 'the conditions of his criminal detention were substantially better.'" *See Maliwat v. Scott*, 2025 WL 1311338, at *4 (W.D. Wash. May 6, 2025). *See also Nwauzor v. GEO Grp.*, 127 F.4th 750, 758 (9th Cir. 2025) ("GEO always resumed paying detainees $1 per day as soon as practicable. GEO never paid its employed detainees Washington's minimum wage. Despite the low pay and working conditions, detainees participated in the VWP because of the situation in which they had been placed. One detainee testified in his deposition: 'I need the money desperately. I have no choice.'"); *Inspection of Northwest ICE Processing Center* at 33, Office of the Immigration Detention Ombudsman (November 20, 2024) ("The facility's non-compliant findings included the following: maintaining facility sanitation and cleanliness, responding to detainee requests, controlling disposable razors, collecting and forwarding attorney forms, responding to detainee grievances, notifying the Contracting Officer's Representative of audits, documenting training, documenting initial medical evaluations, staffing medical, and checking detainees on suicide watch.").[5]

  Mr. Banga is ready to face his additional collateral punishment, having used his time at FDC to wake up from his erratic episode, reconnect with family, and recognize

---

[5] https://www.dhs.gov/sites/default/files/2024-12/24_1120_oido_inspection-report-northwest-ice-processing-center.pdf.

DEFENSE SENTENCING MEMORANDUM
(*United States v. Banga*, No. CR25-013-JNW) - 9

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, WA 98101
(206) 553-1100

that he must finally learn "how to stick to a plan." Ex. 1. Recognizing the punishment he already has and will endure, the Court should sentence him to time served.

DATED this 7th day of August 2025.

Respectfully submitted,

s/ *Mukund Rathi*
Assistant Federal Public Defender
Attorney for Tatenda Banga

DEFENSE SENTENCING MEMORANDUM
(*United States v. Banga*, No. CR25-013-JNW) - 10

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, WA 98101**
**(206) 553-1100**